Brenda V. DAVIS, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security, Defendant.

No. 96–5133–CV–SW–BC–SSA.

United States District Court,
W.D. Missouri,
Southwestern Division.

Dec. 31, 1997.

Robert Beezley, Springfield, MO, for Plaintiff.

Judith Strong, U.S. Atty's Office, Kansas City, MO, for Defendant.

### *ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

LARSEN, United States Magistrate Judge.

Plaintiff Brenda V. Davis seeks review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et. seq. and for supplemental security

income benefits based on disability under Title XVI of the Act, 42 U.S.C. § 1381, et. seq. Plaintiff argues that the Administrative Law Judge ("ALJ") failed to consider plaintiff's impairments in combination and the side effects of her medication, the ALJ failed to make an adequate finding regarding plaintiff's subjective complaints of pain, and the ALJ's finding that plaintiff can perform her past relevant work is not supported by substantial evidence. I find that (1) the ALJ erred in finding plaintiff's subjective complaints of disability not credible, (2) the ALJ's decision that plaintiff can perform her past relevant work is not supported by substantial evidence in the record, and (3) the Commissioner did not satisfy his burden of proving there are jobs in the economy which plaintiff can perform. Therefore, plaintiff's motion for summary judgment will be granted, and defendant's cross motion for summary judgment will be denied.

## I. BACKGROUND

On October 11, 1994, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since February 27, 1994. Plaintiff's disability stems from back and heart problems. Plaintiff's application was denied initially and upon reconsideration. On March 14, 1996, a hearing was held before an Administrative Law Judge. On April 5, 1996, the ALJ found that plaintiff was not under a disability as defined by the Act. An appeal was taken to the Appeals Council who affirmed the decision of the ALJ. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the

Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401; *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir.1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Id.; Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen*, 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker*, 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.* The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant engaged in substantial gainful employment?

Yes= not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.

Yes= go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes= disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes= go to next step where burden shifts to the Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes= disabled.

No = not disabled.

### IV. THE ALJ'S DECISION

On April 5, 1996, the ALJ filed his decision finding that plaintiff is not disabled as defined by the Social Security Act. In doing so, the ALJ specifically found that plaintiff's testimony at the administrative hearing describing total disability was not credible, that she possesses the residual functional capacity to perform both sedentary and light-work occupations, and that her impairments do not prevent her from returning to her past relevant work as a cashier at a convenience store or at a gambling casino (Tr. at 20–21).

The ALJ found not credible plaintiff's testimony that she is very severely restricted in her daily activities; that she needs to lie down for at least 4 hours a day; and that if she were working an 8–hour day, at least 4 of those hours would be spent lying flat on her back. In discounting this testimony, the ALJ noted that the medical records do not reflect a medical need for such a restriction and that the limitations alleged by plaintiff are "personal choice" rather than a medical requirement (Tr. at 18). In support of this conclusion, the ALJ noted that plaintiff continued to work after her heart surgery (in 1989); that her current heart condition would not necessitate these restrictions; that she did not report shortness of breath to her treating physicians and has continued to smoke cigarettes; that in May 1993, she returned to work with a lifting restriction of 20 pounds, not the 5–pound restriction she currently claims; and that her testimony as to pain and activities was inconsistent, i.e., she initially claimed that back pain lasted a half day but later said her back pain was constant, and she alleged severe weakness and fatigue but such complaints were not consistently reported to her treating physicians (Tr. at 18–19).

Concerning plaintiff's capacity to work, the ALJ relied on the opinion of Eric L. Anderson, M.D., who evaluated the file for the state disability determination section on January 13, 1995 (Tr. at 19). In that evaluation, Dr. Anderson concluded, among other things, that plaintiff could frequently lift and carry 10 pounds; occasionally lift and carry 20 pounds; stand and walk for 6 hours during an 8–hour day; occasionally climb ramps or stairs; and occasionally stoop, kneel, crouch, or crawl (Tr. at 18). Finding this opinion to be consistent with the other medical evidence, the ALJ observed that "this would allow the claimant to perform a wide range of sedentary and light work occupations." (Tr. at 19).

Regarding plaintiff's return to past relevant work, the ALJ noticed the Dictionary of Occupational Titles ("Dictionary") which characterizes the work of a cashier-checker as "light"[1] and the work of a cashier at a

---

1. The Dictionary of Occupational Titles defines light work, in part, as follows:

Light Work involves exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary Work.

gambling casino as "sedentary." [2] (Tr. at 15). Relying on the Dictionary and the residual physical functional capacity as found by Dr. Anderson, the ALJ concluded that plaintiff's medical restrictions would not prevent her from returning to her previous work as a cashier at a convenience store or a casino (Tr. at 20). The ALJ essentially used the balance of the record to discount plaintiff's testimony as to the severity of her claimed disabilities.

Because the ALJ found that plaintiff could return to her past relevant work, plaintiff was denied benefits at the fourth step of the sequential analysis.

## V. THE RECORD

The record consists of the testimony of plaintiff and a vocational expert, plaintiff's medical records, a disability report, a vocational report, a pain questionnaire, a daily activities questionnaire, an orthopaedic consultation, a residual physical functional capacity assessment form, a work background form, and an update on plaintiff's medical treatment.

### A. THE MEDICAL RECORDS

The following medical records were before the ALJ prior to the issuance of his decision on April 5, 1996.

#### 1. October 1989—Valley Hospital

On October 23, 1989, plaintiff, then age 39, was admitted to Valley Hospital, Las Vegas, Nevada, complaining of chest pain (Tr. at 130, 132, 134). She was admitted for evaluation of possible angina and with a history of paroxysmal atrial tachycardia ("PAT"). Plaintiff had been on Lanoxin after PAT was diagnosed by a cardiologist (Tr. at 134).

According to the information provided by plaintiff to hospital personnel, she had a five-year history of recurrent PAT and was, during that period, under the care of a cardiologist in San Antonio, Texas (Tr. at 132).

Plaintiff told the hospital personnel that about two weeks before her admission, she was having episodes of heart pounding and

that her pulse rate had been about twice its normal rate. She reported chest pain that began "substernally" (beneath the breastbone), radiated as a burning pain down her left arm, and caused tightness in her throat (Tr. at 132). Plaintiff reported that this frequently occurred with exertion but went away with rest and sleep. On rare occasions, it would happen while plaintiff was resting (Tr. at 134).

Keith G. Brown, M.D., found the symptoms to be "highly suggestive of significant coronary artery disease with possible single vessel disease in the RCA" (right coronary artery) and recommended possible cardiac catheterization (Tr. at 135).

On October 27, 1989, William J. Cavin, M.D., diagnosed plaintiff as suffering from coronary artery disease and performed a bypass graft procedure on plaintiff (Tr. at 136–137). The procedure was performed without significant incident, and plaintiff seemed to tolerate the operation well (Tr. at 157).

On November 2, 1989, plaintiff was discharged from Valley Hospital with instructions to see her doctor within two weeks (Tr. at 130–131). Her prognosis was listed as good (Tr. at 131).

#### 2. August 11, 1993—Sunrise Hospital

On August 11, 1993, plaintiff, then age 42, was admitted to Sunrise Hospital after she was in an automobile accident. She reported neck pain and numbness in her left arm. She was treated and released the same day (Tr. at 261–266).

#### 3. December 1992 to October 1993— Records of Dr. Mark Kabins

On November 14, 1992, plaintiff, then age 42, was injured while working as a cashier at the Gold Strike Hotel. A coin module weighing about 150 pounds fell on her right leg. She was taken to the emergency room and later was diagnosed as having a burst fracture of the L1 in her spine (Tr. at 163–164). Because of her previous medical conditions,

2. The Dictionary of Occupational Titles defines sedentary work, in part, as follows:

Sedentary Work involves exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.

Mark Kabins, M.D., recommended not proceeding with surgery (Tr. at 165).

On April 26, 1993, Dr. Kabins allowed plaintiff to return to work as a cashier "on a light duty basis." She was instructed to avoid repetitive bending, stooping, and lifting of greater than 20 pounds, and to change positions frequently as needed from standing to sitting (Tr. at 168).

On June 2, 1993, plaintiff returned to Dr. Kabins complaining of continued lower back pain and right lower extremity pain. Plaintiff reported to Dr. Kabins that she had returned to work for 3 days but "could not work longer because of incapacitating back and leg pain." (Tr. at 169). Dr. Kabins recommended an aggressive physical therapy program (Tr. at 169).

On July 13, 1993, plaintiff again saw Dr. Kabins and reported that the physical therapy program seemed to help her. Dr. Kabins projected that he would see plaintiff in 4 weeks and she would be able to return to "light duty" work at that time (Tr. at 170).

On August 16, 1993, plaintiff returned to Dr. Kabins and reported that 5 days earlier she had been in an automobile accident (*See* subsection 2, above). As a result of the accident, plaintiff had mild weakness probably due to the pain. Dr. Kabins continued plaintiff on the rehabilitation program, and he indicated that all efforts would be made to return her to work as soon as possible (Tr. at 170).

On October 11, 1993, Dr. Kabins again saw plaintiff and stated that she could return to work at any time within the "realms of the FCE (functional capacity evaluation) which states she may perform at a light physical demand level." (Tr. at 171).[3]

### 4. December 1993—Humana Sunrise Hospital

On December 7, 1993, plaintiff, then age 43, was admitted to Humana Sunrise Hospital complaining of recurring chest pain.

During an exercise treadmill stress test, plaintiff developed chest pain and had a borderline abnormal result. During the stress test, plaintiff exercised for 8 minutes "stopping secondary to fatigue and shortness of breath at a 10 METS workload." (Tr. at 194). Cres P. Miranda, M.D., who performed the test, concluded that plaintiff had a good capacity for exercise for her age with "no diagnostic EKG evidence of ischemia (lack of blood supply to an organ) at this workload but angina was produced with exercise." (Tr. at 194).

A repeat coronary angiography was recommended and performed without complication on December 10, 1993, by Richard Shehane, M.D., a cardiologist (Tr. at 179, 183). Dr. Cavin, who had performed the surgery in 1989, believed that plaintiff was a candidate for medical therapy since she did not seem to have critical coronary artery disease. Dr. Shehane recommended medical therapy, opining that plaintiff was not a candidate for bypass surgery or coronary angioplasty at that time (Tr. at 184). Plaintiff was discharged with the recommendation that she stop smoking, eat right, and start an exercise program (Tr. at 180).

### 5. October 28, 1991 to February 9, 1994—Cardiovascular Center of Southern Nevada

On October 28, 1991, plaintiff came to the Cardiovascular Center of Southern Nevada complaining of chest tightness. She reported that for several months, she had been having a sensation of tightness across the precordial area (in the heart region) and radiating up to her throat. She described the tightness as similar to but not as severe as the pain she experienced before her bypass surgery. Richard R. Shehane, M.D., assessed the problem as coronary artery disease, and he recommended continued medi-

---

3. Although plaintiff's functional capacity evaluation is not part of the record, it is referenced in her worker's compensation evaluation dated December 20, 1993, as follows:

A functional Capacity Evaluation on 9/20/93 reported the patient had some symptom magnification, but probable maximum effort, and was reported to perform light duty with maxi-

mal lift at 22.5 pounds, and frequent lift of 11 pounds, no frequent bending or work below the knee level, and need frequent position changes (Tr. at 197).

As a result of the work-related accident, plaintiff was awarded a 16 percent whole person impairment (Tr. at 201).

cation, a stress test, and further evaluation (Tr. at 222).

On November 4, 1991, plaintiff underwent a treadmill stress test at the Cardiovascular Center of Southern Nevada. The test was performed by Dr. Shehane who reported that, after 6 minutes, the test was terminated because of fatigue. No chest pain occurred (Tr. at 244).

On November 5, 1991, plaintiff returned to see Dr. Shehane. She reported vague chest discomfort, but stated that she continued to work full time (Tr. at 221).

On December 9, 1991, plaintiff returned for a follow-up visit. She had no further symptoms of chest pain and was feeling better, although she complained of fatigue (Tr. at 221, 228).

On February 11, 1992, plaintiff returned to see Dr. Shehane for a follow-up on her cholesterol. She was instructed to follow a low-fat diet. Dr. Shehane noted that plaintiff was doing well from a symptomatic standpoint and was experiencing no chest pains or "shortness of breath." (Tr. at 220).

On February 25, 1992, plaintiff returned to see Dr. Shehane because of some swelling and pain in her extremities. She reported no further chest pain (Tr. at 219).

The following day, on February 26, 1992, plaintiff went to the Center complaining of flu symptoms. She also reported to the nurse that in January she had experienced some discomfort but it eventually went away (Tr. at 226).

On April 13, 1992, plaintiff again saw Dr. Shehane and reported that she was experiencing no further chest pain (Tr. at 218).

On August 10, 1992, plaintiff returned to Dr. Shehane's office for a routine follow-up visit. She had no complaints. She stated that she had experienced chest pain rarely and had used nitroglycerin about twice in the past three months (Tr. at 217).

On February 26, 1993, plaintiff arrived at the Cardiovascular Center for her follow-up. She reported that she was doing fine but had experienced some chest pain about 6 weeks earlier. Plaintiff stated that she had sustained a back injury at work and was re-

quired to wear a back brace (Tr. at 216) (*See* subsection 3, above).

On June 8, 1993, plaintiff again saw Dr. Shehane. She reported having some episodes of chest pain, both exertional and non-exertional. Dr. Shehane noted that plaintiff had not stopped smoking and was not watching her diet (Tr. at 215).

On June 12, 1993, plaintiff underwent another treadmill stress test. This time plaintiff completed 7 minutes before the test was terminated because of "shortness of breath and fatigue." No chest pain was noted (Tr. at 240).

On June 15, 1993, plaintiff returned to see Dr. Shehane and complained of continuing episodes of chest pain and throat pain. The pain was radiating into her left arm and had gotten more severe over the past months. Dr. Shehane assessed the problem as coronary artery disease and recommended repeat cardiac catheterization, coronary angiography, and revisualization of the right and left internal mammary artery grafts (Tr. at 214, 226).

On June 19, 1993, plaintiff went to the Center, and an angiogram was scheduled for the next day to be performed by Dr. Shehane (Tr. at 225).

On July 29, 1993, plaintiff returned to see Dr. Shehane after her cardiac catheterization. She had no chest pain or shortness of breath. Dr. Shehane noted that plaintiff had occluded left and right internal mammary artery grafts but that the coronary artery disease did not appear significant enough to require repeat surgery. Dr. Shehane continued plaintiff on medical therapy (Tr. at 213).

On December 7, 1993, plaintiff came into the office complaining of an episode (the day before) of severe chest pressure, which she described as a squeezing, caving-in sensation that radiated into her left arm and caused nausea and severe diaphoresis (sweating). The episode lasted 30 minutes, resolved itself spontaneously, and left her feeling fatigued. Dr. Shehane recommended that plaintiff be hospitalized to stabilize her on medical therapy (Tr. at 212, 224–225).[4]

---

4. As noted earlier in subsection 4, plaintiff was hospitalized at Humana Sunrise Hospital where she underwent cardiac catheterization but did not undergo any additional surgery.

On December 23, 1993, plaintiff called the Center and reported another episode of chest pain radiating up into her neck. The episode was severe and caused plaintiff to become nauseous. Although the pain subsided, it left her fatigued and feeling "washed-out" (Tr. at 224).

On December 29, 1993, plaintiff returned to see Dr. Shehane. She reported occasional palpitations but no further chest pain, and she told a nurse that she was feeling fatigued. Again, Dr. Shehane recommended that plaintiff stop smoking cigarettes (Tr. at 211, 223).

On February 9, 1994, plaintiff saw Dr. Shehane for a follow-up to see how she was doing with the Nicoderm patch which Dr. Shehane recommended she try. Plaintiff reported that she did not get the prescription filled and was still smoking cigarettes (Tr. at 210).

Finally, on November 16, 1994, Dr. Shehane responded to a request for information on plaintiff from Missouri's Section of Disability Determinations. In that letter, Dr. Shehane reported that as of December 1993, both grafts were totally occluded but her coronary artery disease was insignificant. In consultation with Dr. Cavin who had performed the 1989 surgery, Dr. Shehane decided not to repeat the surgery since her vessel disease had improved. Dr. Shehane concluded by saying, "In view of these findings, it is my impression that this patient should not be considered disabled from her cardiac standpoint. I am aware that the patient has also had a history of back problems, but I am not qualified to give you an opinion regarding whether her back problems will cause any sort of a disability problem." (Tr. at 208).

### 6. June 2, 1994 to October 14, 1994—Lebanon Medical Center

On June 2, 1994, plaintiff was seen at the Lebanon Medical Center having moved to Lebanon, Missouri, from Las Vegas (Tr. at 207).

On October 14, 1994, plaintiff returned to the Center for a "recheck." She reported that "she has gradually been having more chest pain, a little more short of breath than normal and especially noticed her heart pounds if she climbs a flight of stairs." (Tr.

at 205). V.C. Tegtmeyer, M.D., assessed plaintiff as having premature coronary artery disease, signs of increased angina, and increased mild congestive heart failure. He referred her to a cardiologist, David S. Cochran, M.D. (Tr. at 275).

### 7. November 17, 1994, to February 16, 1995—Springfield Medical Clinic

On November 17, 1994, plaintiff was evaluated by Dr. Cochran. Plaintiff described to Dr. Cochran her heart problems since 1993. In recording this discussion, Dr. Cochran wrote:

"Since that time, she has described chest discomfort described as a caving in of her chest when she is out in cold weather. This will radiate to her throat. With walking she describes a heart pounding sensation and these symptoms have been present for the past one year. With exertion she does not have the caving-in sensation. She feels that over the past three to six months she feels more exhausted, more out of breath with walking stairs, vacuuming, and is feeling more tired. She is having no chest pain at rest." (Tr. at 253).

Dr. Cochran noted, "[d]yspnea (shortness of breath) on exertion." (Tr. at 254). Dr. Cochran continued plaintiff on her current medications and planned to get her medical records from Las Vegas and schedule a thallium treadmill test (Tr. at 254).

On February 16, 1995, plaintiff returned to the Springfield Medical Clinic. At that time, she complained that she had been having chest pain and shortness of breath for the past three months. Dr. Cochran anticipated performing a treadmill test within a week or two (Tr. at 250).

### 8. February 29, 1996, to April 29, 1996—Dr. Thomas Huffman

On February 29, 1996, plaintiff saw Thomas Huffman, M.D. During their meeting, plaintiff complained of dyspnea (shortness of breath), rapid heart beat and chest pains. She reported chronic pain which resulted in anxiety and depression. Dr. Huffman recorded, "Discussed cardiac consult-would take 1 month to save for (unintelligible)." (Tr. at 274).

On April 29, 1996, plaintiff returned to see Dr. Huffman. She reported rapid heart spells. Plaintiff complained of night sweat, fatigue, insomnia, rapid heart beat, dyspnea (shortness of breath) and basic pain. Dr. Huffman opined that plaintiff needed both cardiac and back evaluations. He noted, "Major finance issue." He then questioned, "Eligible Medicaid?" (Tr. at 275).

### B. ADMINISTRATIVE RECORDS

The following administrative records were before the ALJ prior to the issuance of his decision on April 5, 1996.

#### 1. Disability Report

On October 26, 1994, plaintiff completed a Disability Report in which she described her past employment (Tr. at 101). She outlined her past work as a casino cashier, a convenience store cashier, a shoe cobbler, and a teacher's aid. Her work record was reported as spanning almost 20 years, from August 1975 to February 1994 (Tr. at 105).

In describing the physical activity involved in her work as a clerk, plaintiff reported walking as much as 8 hours per day, standing as long as 8 hours per day, bending constantly, reaching constantly, and lifting and carrying 25- to 50-pound bags of coins and 50-pound cases of oil (Tr. at 106).

#### 2. Vocational Report

On October 31, 1994, plaintiff prepared a Vocational Report in which she described her previous employment. As a cage cashier, plaintiff reported that she provided change to customers at the casino. As part of her duties, she lifted bags of coins above her shoulders to pour into machines. She reported that she was required to walk as much as 8 hours per day, stand as long as 7 hours per day, frequently bend, lift and carry racks of chips and silver and bags of coins weighing up to 50 pounds (Tr. at 90).

Plaintiff reported that as a cashier at a convenience store, she had to run the cash register, stock shelves, clean machines, stock coolers, fill ice machines, mop floors, clean gas pumps, and cook and stock ready-to-eat foods. She was required to walk as much as 8 hours per day, stand 8 hours per day, bend constantly, and carry cases of motor oil, beer, milk, soda, and groceries about 30 feet or more. She reported that she frequently had to lift and carry items weighing 50 pounds or more and that her work shift was 8 to 12 hours per day (Tr. at 91).

#### 3. Pain Questionnaire

On October 31, 1994, plaintiff completed a pain questionnaire in which she described her back pain as constant with sharp pain running down her hips and legs, and her heart pain sharp—as though her chest were caving in. She recounted that the pain has lasted since November 1992, and that it has progressively gotten worse. Plaintiff indicated that as a result of the pain, she cannot sit or stand for prolonged periods, she can do no bending or squatting, she cannot reach over her head, and she cannot lift over 10 pounds (Tr. at 122).

#### 4. Daily Activities Questionnaire

On October 31, 1994, plaintiff filled out a daily activities questionnaire. In her answers, plaintiff indicated that she can no longer sweep, mop or vacuum; she cannot fold laundry; she cannot do dishes; and she cannot do the shopping. She reported getting only a couple hours of sleep at night. In order to perform grooming, plaintiff wrote, "My husband helps when I can't reach my feet and wash my hair." (Tr. at 123). She reported that her daughter does the household chores (Tr. at 124). She reported that she goes out of the house only once or twice a month, usually to go to the doctor's office or to the store (Tr. at 125). As to why she is not working, plaintiff wrote, "I'm in constant back pain, short breath, tired to the point of exhaustion and feel useless." (Tr. at 126).

#### 5. Orthopaedic Consultation

On January 4, 1995, Charles J. Ash, M.D., F.A.C.S., performed a "limited examination" on plaintiff (Tr. at 246). From the patient history, Dr. Ash learned that plaintiff "had compression fracture L-1 in 1992 with no history of claudication." (Tr. at 246). After performing a series of tests on plaintiff's spine, upper extremities, and lower extremities, Dr. Ash reported the following diagnosis: "compression fracture L-1 with residual

discomfort without definite neurological deficit and without evidence of claudication." (Tr. at 247).

The remarkable results from Dr. Ash's examination were in the thoracic and lumbar spine. Dr. Ash noted that plaintiff has a hump (thoracic kyphosis), and that she has reduced motion in two areas: 55 degree in flexion (normal is 90 degrees) and 10 degrees in extension (normal is 30 degrees).

### 6. Residual Physical Functional Capacity Assessment

On January 13, 1995, Eric L. Anderson, M.D., reviewed "all evidence" dealing with plaintiff at the request of the Social Security Administration for the purpose of determining plaintiff's residual physical functional capacity (Tr. at 109). Based on his review of the evidence,[5] Dr. Anderson made the following findings as to plaintiff's exertional limitations: occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk for about 6 hours in an 8–hour day, sit for about 6 hours in an 8–hour day, and an unlimited ability to push and/or pull (except as shown for lift and carry) (Tr. at 110).

As to plaintiff's postural limitations, Dr. Anderson found that she could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds; she could frequently balance; and she could occasionally stoop, kneel, crouch, and crawl (Tr. at 111).

As to environmental limitations, Dr. Anderson found that plaintiff should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation. He also found that she should avoid even moderate exposure to hazards such as those from machinery and heights (Tr. at 113).

### 7. Work Background

At the March 14, 1996, administrative hearing, plaintiff submitted a list of her work background. Included among this information were descriptions of her work as a cashier at the Gold Strike Casino (1990–1994) and her work as a cashier at a convenience store both in San Antonio, Texas (1987–1988) and in Las Vegas, Nevada (1989). As a cage cashier at the casino, plaintiff had to lift bags of money, fill change machines, and transport money from the coin room to the change booths. As a convenience store clerk, plaintiff had to clean the store, stock the shelves, fill the ice machine, clean machines, and lift cases of motor oil (Tr. at 267).

### 8. Recent Medical Treatment

At the March 14, 1996, administrative hearing, plaintiff submitted an update on her medical treatment. According to this information, plaintiff has seen Dr. T.L. Huffman at Branson West. According to plaintiff, Dr. Huffman has instructed her to watch her diet, take it easy, and avoid exertion. Because of her back problems, she was told not to stand, lift, bend, stoop, or squat. As for her congestive heart failure, she reported that, "[t]hey can't really do anything." (Tr. at 269).

## VI. THE ADMINISTRATIVE HEARING

On March 14, 1996, the ALJ conducted an administrative hearing during which he heard the testimony of plaintiff and Michael K. Lala, a vocational expert.

### A. PLAINTIFF'S TESTIMONY

Plaintiff testified that at the time of the hearing she was 45 years old, married, has a high school degree and some college (Tr. at 37–38).

#### 1. Work History

Plaintiff summarized her work history as including positions as a cashier at a casino, a cashier at a convenience store, and a self-employed cobbler (Tr. at 38). She indicated that she last worked on February 27, 1994, and that the reason she stopped working was because of her chest pain and back pain (Tr. at 38–39).

---

5. It is not entirely clear what was reviewed by Dr. Anderson since there is no listing of the precise records provided to him. I presume, from his notations, that he had before him at least some of the same records that I have here.

As I note later, I have traced his remarks on the residual physical functional capacity assessment to two documents: Dr. Ash's orthopaedic evaluation and Dr. Cochran's initial assessment of plaintiff's coronary problems.

#### 2. Pain

As to the effect of her back and chest pain, plaintiff first testified as follows:

Q. And what caused you to terminate your work at that time (referring to February 27, 1994)?

A. It had gotten to the point to where I just could not do it anymore physically.

Q. Well, what, you know, arms, legs, you know—

A. I was having chest pains constantly—

Q. All right.

A. —and my back hurt so bad that I was just totally exhausted after I'd put in a half a day (Tr. at 38–39).

Later in the hearing, plaintiff testified about the effect of her back and chest pain as follows:

Q. All right. Do you have problems of being weak, fatigued, lack of energy, and that type of thing?

A. Yes, sir.

Q. Is that a daily thing for you?

A. That's all the time.

Q. What time of day do you normally start feeling worn out, so to speak, and tired?

A. About 1:00 in the afternoon.

Q. Just after midday?

A. Yes, sir. By then I'm done (Tr. at 53–54).

#### 3. Heart Problems

Concerning her heart problems, plaintiff testified that she had coronary artery bypass surgery in 1989 (Tr. at 40, 49). At the time, the surgery was successful and she returned to work (Tr. at 49).

Although the surgery provided some relief, plaintiff testified that in December 1993, she began to experience chest pains, which she described as a caving-in of the chest with the pain running up to her neck and down through both her arms (Tr. at 40). The pain felt as thought it was crushing her neck so that plaintiff could not breathe or talk (Tr. at 49). While in the hospital, plaintiff underwent a heart catheterization, which showed that both artery grafts were blocked. Her doctors recommended that she continue on a medical regime and exercise (Tr. at 50).

The medical regime and exercise helped plaintiff until she injured her back in late 1992. From that time until her December 1993 hospitalization for chest pain, plaintiff could not exercise because she could not walk (Tr. at 50–51).

Plaintiff described her angina pain as constant. The pain on her left side is experienced quite often. She may have this pain 4 or 5 days a week and it may last all day (Tr. at 53). She testified that the intense pain can be a grabbing sensation that radiates up her neck and through her arms. The intense pain comes about 2 or 3 times a week and may last 15 to 30 minutes. The intense pain can come at any time, according to plaintiff (Tr. at 52).

#### 4. Back Problems

Plaintiff testified that she had an injury to her back while at work which resulted in a $12,000 worker's compensation payment in 1994 (Tr. at 43). From this injury (which occurred on November 17, 1992), plaintiff testified that she still has pain in her back and legs (Tr. at 43, 44–45). According to plaintiff, the pain radiates down to her right leg and at times her right leg becomes numb to her toes (Tr. at 43, 45–46). The pain can get so intense that it will take her breath away; and she cannot stand, walk, or bend (Tr. at 45). Plaintiff also testified that she has muscle spasms in her lower back occurring mostly at night, 3 to 4 times per week and lasting as long as 3 to 4 hours. These spasms started occurring about a year and a half to two years before the hearing (Tr. at 47–48).

#### 5. Restrictions

Plaintiff testified that she does not do much in terms of daily activities. Most of the work around the house and other household responsibilities are performed by her daughter (Tr. at 42, 59).

Plaintiff testified that her physical restrictions are as follows: she can sit for 25 minutes without changing positions; she can walk about one-half block (although she said

walking makes her short of breath); she can lift about 5 pounds; during an 8–hour day, she can alternately change positions (i.e., sit, stand, and walk) for about 4 hours, but the rest of the day she would have to lie flat on her back (Tr. at 53, 54–55).

At the time of the hearing, plaintiff said that she has to recline 7 to 8 times a day for about 25–30 minutes to alleviate back problems. If she experiences a severe heart episode, she becomes so weak that she has to remain in bed for 2 to 3 hours (Tr. at 57–58).

## B. VOCATIONAL EXPERT'S TESTIMONY

Michael K. Lala, a vocational expert, testified at the hearing. Mr. Lala had reviewed the exhibits in the case before the hearing and was familiar with their contents (Tr. at 61). Mr. Lala testified that from his private practice, he is "familiar with the skills and the physical and mental qualifications needed for the successful performance of many times [sic] of work as well as the needs of employers in the region wherein the claimant resides." (Tr. at 61).

As a hypothetical question, Mr. Lala was directed to assume plaintiff's educational background and work experience, and the physical and mental conditions as described by plaintiff, and then was asked whether there are any jobs in the economy that plaintiff could effectively perform in competition with others. Lala testified that none exist because of plaintiff's constant and varying types of pain.[6] (Tr. at 62–63).

No other hypotheticals were posed to Mr. Lala.

## VII. THE ALJ'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The ALJ relied principally on Dr. Anderson's assessment of plaintiff and the Dictionary of Occupational Titles to construct a finding that plaintiff is not disabled since she can return to her past relevant work. For the following reasons, I find that this

conclusion is not supported by substantial evidence in the record as a whole.

## A. DR. ANDERSON'S ASSESSMENT

■ Dr. Anderson's assessment of plaintiff's residual physical functional capacity is contained in an 8–page Social Security form, which on its face (page 1) states: "We estimate that it will take you about 20 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form." (Tr. at 109). Much of the assessment is in a checklist format with space provided to substantiate the conclusions reached. In completing the form, the medical consultant is instructed as follows:

Base your conclusions on **all evidence** in file (clinical and laboratory findings; symptoms; observations; lay evidence; reports of daily activities; etc.).

Check the blocks which reflect your **reasoned judgment.**

Describe how the **evidence substantiates your conclusions.** (Cite specific clinical and laboratory findings, observations, lay evidence, etc.).

Ensure that you have requested:

* Appropriate treating and examining source statements regarding the individual's capacities ... and that you have given appropriate **weight to treating source conclusions.** (See Section III.)

* Considered and responded to **any alleged limitations imposed by symptoms** (pain, fatigue, etc.) attributable, in your judgment, to a medically determinable impairment. Discuss your assessment of symptom-related limitations in the explanation for your conclusions in A – F below. (See Section II.)

* Responded to all allegations of physical limitations or factors which can cause physical limitations.

---

6. Again, the record is not specific as to what information Mr. Lala was provided before the hearing. I am presuming that Mr. Lala had essentially the same information that I have here because the exhibits were offered and admitted at the administrative hearing before Mr. Lala testified.

**Frequently** means occurring one-third to two-thirds of an 8–hour workday (cumulative, not continuous). **Occasionally** means occurring from very little up to one-third of an 8–hour workday (cumulative, not continuous).

(Emphasis in original) (Tr. at 109).

As support for his conclusions on plaintiff's exertional limitations (e.g., lifting and carrying, walking and standing), Dr. Anderson wrote:

44 year old female, 67 inches tall, 121 pounds, blood pressure 140/75, smoker, compression fracture L1, 1992, work injury, (increase T. hyphasin), lumbar flexion 55 degrees, extension 10 degrees, straight leg raise test 45 degrees, no definite neurological deficiency, compression examination 1/4/95 (Tr. at 110).

(CE) 11/17/94, (P.H.) silent infarction, 10/89–coronary artery bypass surgery with involvement of internal mammary vessels, 12/93 Thallium stress test, both grafts occulated, treated medically with drugs, Cardene, fatigue and chest pain with walking, hypercholesterolemia.[7] (Tr. at 111).

The above-referenced information comes from just two reports in plaintiff's file: the January 4, 1995, report by Dr. Charles J. Ash (the orthopaedic surgeon hired by the State) and the November 17, 1994, report by Dr. David S. Cochran, a Springfield, Missouri cardiologist (Tr. at 246–247; 253–254). I cannot assume that Dr. Anderson had all the evidence admitted at the administrative hearing and before me. The record does not list what information Dr. Anderson was provided and his report does not provide much detail in support of his findings. Moreover, I do not find that his report describes how *this* evidence (the information from Dr. Ash and Dr. Cochran) substantiates his conclusions as to plaintiff's exertional limitations.

As to plaintiff's environmental limitations, Dr. Anderson checked that plaintiff should avoid concentrated exposure to extreme cold and heat, and checked that plaintiff should avoid concentrated exposure to fumes, dusts, gasses, and poor ventilation. He also checked that plaintiff should avoid moderate exposure to hazards. When asked to (1) describe how environmental factors impair plaintiff's activities, (2) identify the hazards to be avoided, (3) explaining how and why the evidence supports each conclusion and (4) citing specific facts, Dr. Anderson wrote: "Heavy Machinery." (Tr. at 113).

In assessing the symptoms alleged by plaintiff to produce physical limitations, Dr. Anderson was asked to discuss: (1) whether the symptoms are attributable to a medical impairment; (2) whether the severity or duration of the symptoms are disproportionate to those expected based on plaintiff's medically determined impairments; and (3) whether the severity of the symptoms and their alleged effects on function are consistent with the "total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior or habits." (Tr. at 114). In response to this question, Dr. Anderson wrote:

Pain—atypical angina with known coronary artery disease. Pain in back with fractured L1. Pain is considered and (durs) reduced functional capacity.[8] (Tr. at 114).

Dr. Anderson merely lists the two known pain-causing impairments for plaintiff. He does not discuss symptoms other than an unclear reference to pain being considered. The balance of his remarks are unintelligible to me and I believe would be unintelligible to any other reader, including the ALJ. Dr. Anderson does not discuss the severity or duration of the pain, whether the pain is proportionate with that expected from one with similar back and heart problems, or whether the pain is consistent or inconsistent with other evidence in plaintiff's file.

There are many reasons that I do not find the ALJ's reliance on Dr. Anderson's report to be well-placed. First, there is nothing in

7. I have attempted to interpret Dr. Anderson's notes, which are cryptic. The notations in parenthesis are incapable of interpretation, at least by me.

8. Again, I have interpreted the notations of Dr. Anderson. I believe that the word in parenthesis plus the arrow pointing to RFC mean, "does not result in reduced functional capacity," but I cannot be certain that this interpretation is correct. However, since everything else in the assessment points to this conclusion, this is the interpretation I have given this unintelligible writing.

the record recounting Dr. Anderson's qualifications to be drawing conclusions about the nature and extent of plaintiff's alleged disabilities solely from the medical and administrative records here. The only thing I can glean from the record is that he is a medical doctor. Second, there is nothing in the record listing precisely what information was provided to Dr. Anderson before he reached his conclusions. Third, my review of his assessment and the record here demonstrates that he relied on just two reports: the January 4, 1995, orthopaedic report of Dr. Ash (who was hired by the State) and the November 17, 1994, coronary report of Dr. David S. Cochran (which was prepared before Dr. Cochran had plaintiff's medical records from Las Vegas). There is no discussion as to how *this* information justifies the conclusions Dr. Anderson reached. Fourth, in response to the myriad of questions posed by the Social Security Form, Dr. Anderson's answers are frequently not provided or are non-responsive, cursory, or unintelligible, or a combination of the three. Fifth, Dr. Anderson did not have plaintiff in front of him when he completed the assessment, which I find to be curious since plaintiff did appear for testing before Dr. Ash just 9 day earlier. It seems to me that if the Social Security Administration wanted to know plaintiff's residual physical functional capacity, Dr. Ash was in a better position to give an opinion, at least from an orthopaedic standpoint, as to how much plaintiff could lift and carry, walk and stand. Dr. Ash had plaintiff in front of him, he had tested her physical capacities, and, based on his certification as an orthopaedic surgeon, he is more qualified than Dr. Anderson to present opinions about plaintiff's back problems.

## B. DICTIONARY OF OCCUPATIONAL TITLES

Next, the ALJ administratively noticed the Dictionary of Occupational Titles which defines the position of cashier at a casino as "sedentary" and the position of cashier-checker at a convenience store as "light." Based on Dr. Anderson's opinion that plain-

tiff can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, the ALJ found that plaintiff's impairments do not prevent her from performing *these jobs,* which he simply concluded are her past relevant work. Therefore, the ALJ found that plaintiff is not disabled under the Social Security Act.

Of course, no one had an inkling that the ALJ would rely on the Dictionary of Occupational Titles until his opinion was filed. Had it been known at the time of the administrative hearing, I am certain that plaintiff's counsel would have questioned both plaintiff and Mr. Lala about whether the Dictionary's descriptions of the two positions are, in fact, reliable and actually reflect those jobs as they exist in plaintiff's community and in the nation. But plaintiff's lawyer never got the chance. As reflected below, there are significant questions about the reliability of the Dictionary as used here.

### 1. Casino Cashier Position

■ I believe we can narrow our focus here by recognizing that the State of Missouri's Constitution provides for river boat gambling on the Missouri and Mississippi Rivers.[9] Plaintiff lives in southwest Missouri, a geographic part of the State that is not adjacent to either the Missouri River or the Mississippi River. I will take judicial notice of the fact that most of the Missouri casinos are located in the Kansas City or St. Louis areas, nowhere near plaintiff's region of the State. Therefore, I do not believe that the ALJ's finding that plaintiff could return to her past relevant work as a casino cashier is even geographically possible. More importantly, however, the Dictionary's designation of a casino cashier as "sedentary" is subject to debate. According to the Dictionary, a "sedentary" job is one that involves exerting up to 10 pounds of force occasionally or a negligible amount of force frequently. However, the record in this case is undisputed that after plaintiff suffered her worker's compensation injury on November 14, 1992,

---

9. Article 3, Section 39(e), of the Missouri Constitution provides that:

The general assembly is authorized to permit only upon the Mississippi River and the Mis-

souri River lotteries, gift enterprises and games of chance to be conducted on excursion gambling boats and floating facilities.

and was released to return to her job as a casino cashier on "light duty," light duty was defined as a "maximum lift at 22.5 pounds, and frequent lift of 11 pounds." (Tr. at 197). Clearly, the job of casino cashier as described in the Dictionary of Occupational Titles is not the same job plaintiff had performed in Las Vegas. The casino cashier position in Las Vegas involved a great deal more physical capacity than that described in the Dictionary of Occupational Titles.

Plaintiff provided to the Social Security Administration several detailed descriptions of the work she performed as a casino cashier. As a cage cashier at the Gold Strike Casino, plaintiff reported that she had to lift money bags, fill change machines, and move money from the coin room to the change booths (Tr. at 267). She had to lift bags of money above her shoulders to pour into machines. She had to walk as much as 8 hours a day, stand as long as 7 hours a day, and lift and carry bags of coins weighing up to 50 pounds (Tr. at 90).

Plaintiff's accounts of the nature and scope of this work are consistently reported in her Disability Report, her Vocational Report, and her Work Background Report. There is nothing in the record to suggest that plaintiff inflated the demands of this job, and the ALJ never questioned plaintiff about the accuracy of her descriptions of the position during the administrative hearing. Finally, there is no finding in the ALJ's decision that plaintiff's description of the work of a casino cashier is not credible as compared with the description in the Dictionary. If anything, the Dictionary definition in this case should be highly suspect in light of the absurd conclusion that plaintiff was returned to "light duty" with a lifting restriction of *20 pounds* to the position of casino cashier, which the Dictionary classifies as "sedentary" or normally requiring the lifting capability of no more than *10 pounds.*

Because the uncontradicted evidence before the ALJ established that the duties of a casino cashier include lifting and carrying bags of coins weighing up to 50 pounds, and because Dr. Anderson found (and the ALJ accepted) that plaintiff could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, the ALJ clearly erred in finding that plaintiff could return to her past relevant work as a casino cashier. This is despite the fact that there is not substantial evidence in the record to support the finding that plaintiff can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.

Because the Dictionary of Occupational Titles does not accurately represent the nature and the scope of the work plaintiff performed as a casino clerk, and because the lifting and carrying restrictions the ALJ found plaintiff suffers exceed those required for the position of a casino cashier, I find that the ALJ erred when he ruled that plaintiff could return to this previous employment.

### 2. Convenience Store Cashier Position

As to the position of convenience store cashier, the ALJ again turned to the Dictionary of Occupational Titles and found that the job of cashier-checker is described as "light." Light work, according to the Dictionary, involves occasionally exerting up to 20 pounds and frequently exerting up to 10 pounds. The ALJ did not discuss how or why he selected the position of cashier-checker as being substantially similar to plaintiff's past relevant work. He simply plucked the position description from the Dictionary and assumed it involved the same type of work as that which plaintiff performed as a cashier in a convenience store without accounting for the vast, material differences between the two descriptions.

The Dictionary of Occupational Titles describes the position of cashier-checker as follows:

211.462–014 CASHIER–CHECKER (retail trade) Operates cash register to itemize and total customer's purchases in grocery, department, or other retail store. Review price sheets to note price changes and sale items. Records prices and departments, subtotals taxable items, and totals purchases on cash register. Collects cash, check, or charge payment from customer and makes change for cash transactions. Stocks shelves and marks prices on items. Counts money in cash drawer at beginning and end of work shift. May record daily transaction amounts from cash register to balance cash drawer. May weigh items, bag merchandise, issue

trading stamps, and redeem food stamps and promotional coupons. May cash checks. May use electronic scanner to record price. May be designated according to items checked as Grocery Checker (retail trade).

In detailing the requirements of the position of Cashier–Clerk, the Dictionary of Occupational Titles lists, in part, the following physical demands:

Stooping—Occasionally (up to 1/3 of the time)

Kneeling—Occasionally (up to 1/3 of the time)

Crouching—Occasionally (up to 1/3 of the time)

In denying plaintiff benefits, the ALJ found that she could return to her previous employment as a convenience store clerk, as defined by the Dictionary of Occupational Titles. Specifically, the ALJ discounted plaintiff's claimed restrictions on her daily activities and noted that "[t]he medical records do not show any medical need for this severe a restriction. On May 26, 1993, following her back problems, she was released to return to work with limitations of 20 pounds lifting, and to avoid repetitive bending, and stooping." (Tr. at 18).

There are many problems with the ALJ's analysis here. First, plaintiff was not returned to work on *May* 26, 1993. On *April* 26, 1993, her treating physician wrote that "we will allow her to return to work on a light duty basis. She is to avoid repetitive bending, stooping, and lifting of greater than 20 lbs." (Tr. at 167–168).

Second, the medical restrictions that the ALJ relied upon were *ordered* on April 26, 1993; but plaintiff returned to her treating physician three times after that date for treatment and she was not *released* to return to work until October 11, 1993 (Tr. at 171).

Third, the medical restrictions imposed on plaintiff in 1993 were that she was to avoid repetitive bending, stooping and lifting greater than 20 pounds; but the Dictionary of Occupational Titles indicates that the cashier-checker position requires one to have the physical capacity to bend, kneel and crouch up to 1/3 of the time.

Fourth, these medical restrictions dealing with plaintiff's back problem pre-date December 7, 1993, when plaintiff was hospitalized with angina at Humana Sunrise Hospital; and therefore the restrictions did not take into account plaintiff's reoccurring heart problem (Tr. at 194).

Fifth, although the ALJ concluded that plaintiff's limitations were "more of a personal choice", the record is clear that plaintiff was regularly and gainfully employed for almost 20 years until she suffered the combination of her back problem and heart problem; and, once these two problems converged in late 1993, it was just three months later that she stopped working entirely on February 27, 1994 (Tr. at 18, 105, 267).

Sixth, plaintiff's past relevant work was as a convenience store cashier which required that she perform work not described in the Dictionary of Occupational Titles such as cleaning machines, cleaning gas pumps, stocking coolers, filling ice machines, mopping floors, and carrying cases of motor oil, beer, soda and groceries for 30 feet or more (Tr. at 91). There is no evidence in the record that plaintiff's characterization of a convenience store cashier was inaccurate; indeed, Mr. Lala (the vocational expert) testified at the administrative hearing that he is familiar with employers' needs in the region and that plaintiff could not perform *any* job in the economy because of her pain (Tr. at 62–63). The ALJ never questioned the accuracy of plaintiff's job description, either during the hearing or in his decision.

Seventh, the Dictionary (although prepared by the Department of Labor) is suspect as used here, and it should not have been administratively noticed and solely relied upon in light of its obvious inaccuracy as to the casino cashier position and its total lack of a description for a convenience store clerk.[10]

10. In a preface to the Dictionary, the Department of Labor cautions the reader that "these ratings may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities" and that "[u]sers who need more specific job require-

ments should supplement this data with local information detailing jobs within their community." *See* Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Special Notice, page vii, U.S. Department of Labor (1993).

Eighth, plaintiff submitted a Claimant's Recent Medical Treatment form at the March 14, 1996, administrative hearing in which she reported that her treating physician, Dr. T.L. Huffman, had instructed her not to stand, lift, bend, stoop, or squat because of her back problems—all physical capabilities required for the cashier position (noted by the ALJ) for at least up to one-third of the time according to the Dictionary of Occupational Titles.

Based on this evaluation, I find that the ALJ erred when he found that plaintiff could return to her past relevant work as a convenience store cashier. The ALJ's own evaluation relied on the fact that plaintiff was released to return to work with the limitations that she avoid repetitive bending and stooping, yet he found that she could return to past relevant work which, according to the definition he selected in the Dictionary, requires bending and stooping. Therefore, despite all of the other problems with his analysis outlined above, the ALJ's own reasoning does not support his conclusion. The ALJ's conclusion that plaintiff can return to her past relevant work as a convenience store clerk is clearly not supported by substantial evidence in the record.

### VIII. PLAINTIFF'S CREDIBILITY

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. *Benskin v. Bowen,* 830 F.2d 878, 882 (8th Cir.1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. *McClees v. Shalala,* 2 F.3d 301, 303 (8th Cir.1993); *Polaski v. Heckler,* 739 F.2d at 1322. The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. *Hall v. Chater,* 62 F.3d 220, 223 (8th Cir.1995); *Robinson v. Sullivan,* 956 F.2d 836, 839 (8th Cir.1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. *Robinson v. Sullivan,* 956 F.2d at 841.

In this case, the ALJ's judgment is not supported by substantial evidence on the record as a whole. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. Consideration must be given to all relevant factors, including plaintiff's prior work record; observations by third parties and treating and examining physicians; plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler,* 739 F.2d at 1322.

In discounting plaintiff's allegations of pain, the ALJ noted several matters that caused him to conclude that plaintiff's alleged restrictions were more in the nature of "personal choice" than real limitations. Specifically, the ALJ pointed out that: (1) plaintiff claims she is unable to work, but she did return to work after her heart surgery and her current heart condition does not necessitate the claimed restrictions; (2) plaintiff's testimony about chest pain and shortness of breath are consistent with total disability, but she did not report shortness of breath to her treating physicians and she continues to smoke; (3) plaintiff alleged she could lift only 5 pounds, but she was released to work in May 1993 with a work restriction of 20 pounds; (4) plaintiff's descriptions of her pain and activities were somewhat inconsistent in that she initially said she had back pain after a half a day but later said she was "done for" by early afternoon; and (5) plaintiff alleged severe weakness and fatigue, but she did not report these on a consistent basis to her treating physician and are not "mandated" by her physical limitations (Tr. at 18–19). I will address each of the five matters relied on by the ALJ, and demonstrate why I believe that reliance is erroneous.

### A. PLAINTIFF'S HEART CONDITION

Concerning plaintiff's heart condition, the ALJ wrote:

In reaching this conclusion it is specifically noted that the claimant continued to work after her heart surgery, and that the current heart condition would not necessitate these restrictions (Tr. at 18).

It is true that plaintiff returned to work after her heart surgery, but the heart sur-

gery was performed on *October 27, 1989*. Since that time plaintiff has experienced continued and increased heart pain, which is substantiated by her voluminous medical records. The only physicians who have expressed the opinion that plaintiff's heart condition is not disabling are Dr. Richard R. Shehane, who last saw plaintiff on February 9, 1994, and Dr. Eric L. Anderson, who never saw plaintiff but who on January 13, 1995, reviewed unspecified medical and administrative records in plaintiff's case for the State.

Dr. Shehane's opinion, provided in a November 16, 1994, letter, stated that he does not believe plaintiff to be disabled from a cardiac standpoint but he does not define or explain his understanding of the concept of "disabled" or substantiate why he arrived at his conclusion. Moreover, Dr. Shehane is quick to add in his letter that he knows about plaintiff's back problems and is not qualified to give an as to whether the back problems result in a disability. Also, Dr. Shehane last saw plaintiff on February 9, 1994, and therefore his opinion could not have considered the deteriorating nature of plaintiff's condition over a two-year period, i.e., from February 9, 1994, to March 14, 1996. Finally, Dr. Shehane has some credibility issues that go unaddressed by the ALJ. First, plaintiff owes Dr. Shehane over $700.00, a matter about which the doctor reminded plaintiff on the same day he expressed his adverse opinion in her case (Tr. 209). Second, Dr. Shehane made a decision in late 1993 (when plaintiff's heart problem again erupted) to treat plaintiff medically and not surgically (Tr. 224–225). Certainly, he has every reason to maintain that plaintiff's condition was not disabling and would not progress into a disabling condition in order to justify his own decision and actions. So, as I have mentioned earlier, we are left with the opinion of Dr. Anderson—a medical doctor whose qualifications are unknown, who reviewed unspecified records, who never saw plaintiff, and who prepared a report that I find to be an inadequate basis upon which to deny plaintiff benefits.

Plaintiff's testimony was that she recovered from the 1989 heart surgery and was doing well until late 1992. Indeed, she worked throughout that period. Then on November 14, 1992, she suffered a back injury at the Gold Strike Hotel and Casino which caused her to be off work until October 11, 1993, almost a year later, when she was returned to "light duty." Three months later, plaintiff stopped working entirely because the combination of her back and heart problems made it impossible for her to recover. In essence, plaintiff was caught in a medical "Catch–22," that is, her heart problem required her to exercise but her back problem prevented her from exercising, and the resulting pain from both the heart and the back effectively prevented her from working. This portion of plaintiff's testimony is completely corroborated by her medical records and employment history. There is simply no credible evidence disputing plaintiff's claimed disabilities.

### B. SHORTNESS OF BREATH

Concerning the effects of plaintiff's claimed disabilities, the ALJ wrote:

The claimant's description of her daily activities in her testimony and description of chest pain and shortness of breath precipitated by minimal activities is consistent with her claim of total disability, yet she has not reported the shortness of breath to her treating physicians and has continued smoking (Tr. at 18–19).

It is true that plaintiff has struggled with her addiction to tobacco and that she has been unsuccessful in her efforts to "wean" herself from cigarettes (Tr. 220). It is not true, however, that plaintiff failed to report shortness of breath to her treating physicians. The medical records reflect that plaintiff experienced, reported or discussed shortness of breath on February 11, 1992; June 12, 1993; July 29, 1993; December 7, 1993; October 14, 1994; November 17, 1994; February 16, 1995; February 29, 1996; and April 29, 1996. The records clearly show that shortness of breath was not a major concern by plaintiff's treating physicians until October 14, 1994, when plaintiff reported she had been "a little more short of breath than normal." From that point forward, plaintiff consistently reported worsening dyspnea or shortness of breath to her treating physicians.

The fact that the medical records clearly show that plaintiff consistently reported shortness of breath to her physicians directly contradicts the ALJ's conclusion that plaintiff's subjective complaints of shortness of breath are not credible because she failed to report it. And, in the words of the ALJ, "[t]he claimant's description of her ... shortness of breath precipitated by minimal activities is consistent with her claim of total disability".

### C. PLAINTIFF'S ABILITY TO LIFT

Next, the ALJ notes that plaintiff's claimed 5-pound limitation on lifting objects is suspect because she was released to work in May 1993 with a work restriction of 20 pounds. Specifically, the ALJ wrote:

> On May 26, 1993, following her back problems, she was released to return to work with limitations of 20 pounds lifting, and to avoid repetitive bending, and stooping (Tr. at 18).

As mentioned earlier, plaintiff's lifting restrictions were not recommended on May 26, 1993, but on April 26, 1993; and after that date, she had to return to her treating physician on three occasions for treatment because she could not perform her job even with those restrictions. It was not until October 11, 1993, that plaintiff actually returned to work under "light duty," and just three months later she stopped working entirely because of the pain.

In relying on this event as evidence detracting from plaintiff's alleged disabilities, the ALJ failed to consider several important facts including the following:

1. In imposing these 1993 restrictions, the doctor cautioned plaintiff to avoid bending and stooping, the very capabilities required by the Dictionary of Occupational Titles for a cashier-checker (again, the definition selected by the ALJ).

2. These October 1993 restrictions concerning plaintiff's back problem pre-dated the reoccurrence of plaintiff's heart problems in December 1993 and did not contemplate the combined effect of both problems on plaintiff's ability to work.

3. Plaintiff had a continuous record of employment until the convergence of her back and heart problems in December 1993, and then it was just three months before she had to give up working entirely.

In attacking plaintiff's credibility, the ALJ selected isolated and, at times, dated events of questionable relevance when viewed in fullness of the record. I do not find that there is substantial evidence here disputing plaintiff's claimed restriction of lifting 5 pounds. Instead, the overwhelming medical and lay evidence is that plaintiff's restrictions have increased in number and her ability to lift has gotten progressively worse over the years, and today she can no longer work and is (most recently) suffering anxiety and serious depression over her situation.

### D. PLAINTIFF'S ALLEGED INCONSISTENT TESTIMONY

The ALJ noted that plaintiff changed her story while testifying about her pain and daily activities. Specifically, the ALJ pointed out:

> The claimant's descriptions of her pain and activities was somewhat inconsistent. She initially alleged back pain after a half day of work, and later said that she had constant back pain and was "done for" by early afternoon (Tr. at 19).

This is nothing short of a mischaracterization of plaintiff's testimony. I have quoted verbatim plaintiff's testimony before the ALJ in the section dealing with the administrative hearing. It is clear that in responding to the ALJ's questions, plaintiff first said she stopped working (on February 27, 1994) because her back hurt so badly that she was totally exhausted after a half day of work (Tr. at 38–39). Later, in response to her attorney's questions, plaintiff said she *currently* has problems of weakness and fatigue, and she normally feels worn out by midday (Tr. at 53–54). There is nothing particularly inconsistent about this testimony even if plaintiff's responses were addressing the same time period. But they were not. Initially, plaintiff was asked about her pain and its effects as of February 27, 1994; later,

plaintiff was asked about her pain and its effects as of March 14, 1996.

### E. REPORTS OF WEAKNESS AND FATIGUE

Finally, the ALJ criticized plaintiff because she alleged severe weakness and fatigue but did not report these complaints on a consistent basis to her treating physicians. Specifically, the ALJ wrote:

> She alleged severe weakness and fatigue, but these complaints were not stated to her treating physicians on any consistent basis and are not mandated by her physical limitations (Tr. at 19).

First, I am somewhat perplexed by the ALJ's apparent conclusion that severe weakness and fatigue may mandate "physical limitations." It seems to me that weakness and fatigue *are* "physical limitations." Either they exist or they do not. Perhaps the ALJ meant to say that plaintiff's alleged weakness and fatigue do not prevent her from returning to work because of Dr. Anderson's opinion as to her residual physical functional capacity, but I cannot be certain of that so I view the referenced language as surplusage.

As to plaintiff's consistent reporting of weakness and fatigue, the medical records are replete with instances when she complained to her treating physicians of such problems:

* On December 9, 1991, plaintiff reported fatigue to Dr. Richard R. Shehane (Tr. at 221, 228).

* On December 7, 1993, plaintiff came to Dr. Shehane's office complaining of chest pain and fatigue (Tr. at 212, 224–225).

* On December 23, 1993, plaintiff complained to Dr. Shehane about fatigue and feeling "washed out." (Tr. at 224).

* On December 29, 1993, plaintiff complained of fatigue to a nurse in Dr. Shehane's office (Tr. at 211, 223).

* On November 17, 1994, Dr. David S. Cochran wrote that plaintiff reported feeling exhausted over a period of 3 to 6 months (Tr. at 253).

* On April 29, 1996, plaintiff reported fatigue to Dr. Thomas Huffman (Tr. at 275).

In addition to the above list, the medical records contain other references where the presence of fatigue may be logically inferred, particularly after December 7, 1993, when plaintiff was hospitalized again for heart problems. For example, on October 14, 1994, plaintiff saw Dr. V.C. Tegtmeyer who reported that plaintiff complained of shortness of breath, chest pains, and her heart pounding when "she climbs a flight of stairs." (Tr. at 205). On February 16, 1995, plaintiff saw Dr. Cochran and complained of shortness of breath (Tr. at 250). On February 29, 1996, plaintiff saw Dr. Huffman and complained of shortness of breath, rapid heart beat and chest pains which were resulting in anxiety and depression (Tr. at 274). Furthermore, and perhaps more importantly, there is nothing in the medical records after December 7, 1993, indicating that plaintiff is active or capable of being active despite the combination of her back problem, her heart problem, and the resulting anxiety and depression.

Again, I do not find support for the ALJ's conclusion that plaintiff is unworthy of belief because she did not consistently report fatigue to her treating physicians. The medical records, instead, show that her doctors reported fatigue or symptoms of fatigue consistently after December 7, 1993. In addition, everything else in the file paints the picture of a person who is progressively failing in health and becoming less and less capable of performing any type of work, either at home or in the workplace.

### F. CREDIBILITY CONCLUSION

In several respects, this case is similar to one decided in 1995 by the Eighth Circuit. See *Frankl v. Shalala* 47 F.3d 935 (8th Cir. 1995). In the *Frankl* case, which also involved a claimant with heart disease, the court reversed a district court decision favorable to the Commissioner because the ALJ had relied upon isolated and dated medical records rather than the medical evidence as a whole, because the ALJ relied upon a residual functional capacity assessment which may be evidence "but cannot constitute substantial evidence" without more, and because the ALJ relied upon an old medical report and

**1172**

did not give weight to subsequent supporting evidence. *Frankl,* 47 F.3d at 938–939.

Based on my analysis of the medical records, the administrative records, and the testimony before the ALJ, there is simply no reason to question, much less suspect, plaintiff's claimed disabilities or their impact on her ability to work. Plaintiff's prior work record supports her testimony, the myriad medical records support her testimony, plaintiff's daily activities support her testimony—in fact, when the factors listed in *Polaski v. Heckler* are examined, it is clear that based on this record, plaintiff's subjective complaints of disability are credible.

### IX. COMMISSIONER'S BURDEN

Because there is not substantial evidence in the record to support the ALJ's determination that plaintiff can return to her past relevant work, the burden shifts to the Commissioner to prove that there are jobs in the economy which plaintiff can perform. I find that this burden has not been met.

As mentioned above, the ALJ's determination that plaintiff's testimony was not credible is not supported by substantial evidence. The vocational expert testified that, considering the limitations described by plaintiff during the hearing, there are no jobs in the economy that plaintiff can perform. Therefore, there is no question that the Commissioner did not meet his burden of showing that there are significant jobs in the economy which plaintiff can perform. Based on the regulations promulgated by the Social Security Administration, a finding that plaintiff is disabled is mandated.

### X. CONCLUSION

For the reasons stated above, I find that (1) the ALJ erred in finding plaintiff's subjective complaints of disability not credible, (2) the ALJ's decision that plaintiff can return to her past relevant work is not supported by substantial evidence in the record, and (3) because the vocational expert testified that there are no jobs plaintiff could perform based on her subjective complaints, the Commissioner did not satisfy his burden of proving there are significant jobs in the economy which plaintiff can perform. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is granted. It is further

ORDERED that defendant's cross motion for summary judgment is denied. It is further

ORDERED that this case be remanded for a determination of disability and an award of benefits.